# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| **FIRST HORIZON BANK and** | ) | |
| **FIRST HORIZON CORPORATION,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No.** |
| | ) | |
| **CHRISTOPHER GEORGE** | ) | |
| **FRANK,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## VERIFIED COMPLAINT

Plaintiffs First Horizon Bank ("the Bank") and First Horizon Corporation ("FHC") (collectively referred to as "Plaintiffs" or "First Horizon") file this Verified Complaint against Defendant Christopher George Frank ("Frank" or "Defendant"), alleging as follows:

### PARTIES

1.     The Bank is a Tennessee banking corporation, with its principal place of business at 165 Madison Avenue, Memphis, Tennessee 38103.  The Bank is a wholly-owned subsidiary of FHC.

2.     FHC, formerly known as First Horizon National Corporation, is a Tennessee corporation, first incorporated in 1968, with its principal place of business at 165 Madison Avenue, Memphis, Tennessee 38103.  FHC is a bank holding company and a financial holding company.

3.     Frank is an individual resident of Hamilton County, Tennessee, and is a former employee of First Horizon Advisors, Inc. ("FHA"), a wholly-owned subsidiary of the Bank. On

information and belief, Frank can be served with service of process at 524 Hill Pointe Lane Chattanooga, Tennessee 37405.

## JURISDICTION AND VENUE

4.      This Court has original subject-matter jurisdiction over this action because First Horizon brings a federal claim pursuant to the federal Defend Trade Secrets Act, 18 U.S.C. § 1836. The Court has subject matter jurisdiction over these claims pursuant to 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.

5.      This Court has supplemental jurisdiction over First Horizon's state law claims under 28 U.S.C. § 1367 because they arise out of the same set of operative facts as the federal claim.

6.      Venue is proper in this Court under 28 U.S.C. § 1391(b) because the causes of action arose in Hamilton County, Tennessee, and Frank is a resident of Hamilton County, Tennessee.

7.      Personal jurisdiction over Frank exists because he is a resident of Hamilton County, Tennessee.

## FACTS

8.      Frank began working for First Tennessee Bank in 1995.  In 2019, First Tennessee Bank changed its name to First Horizon Bank.  Prior to August 11, 2022, Frank's position with First Horizon was Vice President, Investment Officer; his position with FHA was Vice-President, Financial Advisor.

9.      Frank was a registered representative and an investment advisor representative with FHA and was an insurance agent with FHA and its affiliated insurance agency. In those roles, Frank provided brokerage and investment management services and insurance products to First

2

Horizon customers.  Particularly, Frank worked closely with First Horizon banking employees and had access to the confidential information of First Horizon banking customers.

10.     Frank resigned without notice on August 11, 2022.

### Frank's Access to and Use of First Horizon's Confidential and Proprietary Information

11.     Frank's employment with FHA included coordinating the buying and selling of securities in interstate commerce, and providing securities-related advice and insurance products to clients in Tennessee and other states, including First Horizon banking clients. These services and the financial products sold by Frank generated substantial revenue for First Horizon.

12.     Frank had a prominent, public-facing role at First Horizon and served as a "face" of First Horizon, including to individual and institutional First Horizon clients.  Frank's role allowed him to acquire extensive knowledge of the details of the banking and securities relationships between First Horizon and its clients, including high-net-worth First Horizon private banking clients, and extensive knowledge of the First Horizon financial products offered to its clients.

13.     As part of his role, Frank had unfettered and regular access to First Horizon's confidential and proprietary information including, but not limited to, its financial products and the fees charged to its clients, and confidential customer information, including the identities of and other information about First Horizon's private banking clients (the "Confidential Information").  First Horizon maintains significant safeguards to protect its Confidential Information from public disclosure.

14.     Throughout his time with First Horizon, Frank regularly acknowledged his duty to maintain the confidentiality of First Horizon's Confidential Information, to which he had access through his employment.

15.     As an officer of First Horizon and an employee of its wholly-owned subsidiary, Frank was eligible to enroll and did enroll in First Horizon's Deferred Compensation Bonus Program and executed a "Financial Advisor Participation Agreement" (the "Participation Agreement") with the Bank, a copy of which is attached hereto as **Exhibit A**.

16.     In exchange for incentive awards of restricted stock units ("RSUs") in FHC, Frank signed the Participation Agreement, in which he agreed to certain reasonable restrictions on his employment-related activities for a term extending twelve months past the end of his employment, including the following:

*Non-Disparagement and Non-Interference*

> You agree that you will not directly or indirectly undertake, implement, participate in, assist in, nor encourage any activity or efforts which damages the business or personal reputations of the Company [defined as the Bank, FHC and any wholly-owned subsidiary of the Bank or FHC] or any of its officers, directors, advisory board members, employees, affiliates, customers, vendors, or business partners, or which create a significant risk of causing such damage.  You further agree that you will not, and will not attempt to, directly or indirectly interfere with any relationship of the Company with any of its officers, directors, advisory board members, employees, customers, vendors, business partners, charities, civic organizations, or the communities in which the Company operates.

*Non-Disclosure*

> In order to protect the legitimate interests of the Company, you agree that you will not disclose to others at any time in the future, whether directly or indirectly, any information relating to the Company's business operations, plans, or other confidential business information and/or trade secrets of the Company which you received or to which you were given access during your employment with the Company.  If such information is required to be produced by law, court order, or governmental authority, you must promptly notify the Company of that obligation. . . .
> You agree that you will return to the Company any and all documents belonging to it, as well as any other property which belongs to it, and that no such documents or materials or property will be taken or retained by you after your employment terminates.  The term "documents" includes any record on any physical or electronic medium.

4

With respect to any information concerning one or more specific customers which identifies any such customer or which includes sensitive identity information such as social security numbers, this non-disclosure covenant does not expire.

*Non-Solicitation*

In order to protect the legitimate interests of the Company, you agree that you will not, either on your own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit, hire, or encourage any person who is then an employee of the Company to leave the employment of the Company.

In order to protect the legitimate interests of the Company, you further agree that you will not, either on your own behalf or on behalf of any other person or entity, in any manner directly or indirectly solicit or contact any person or entity who is a Customer of the Company at the time of such solicitation or contact, with the intent or effect of (i) providing one or more services to the Customer of a nature similar to services provided by the Company to customers generally, or (ii) encouraging the Customer to end, diminish, or move any of his, her, or its accounts or relationships away from the Company, or (iii) encouraging the Customer to refrain from establishing, maintaining, or expanding any account or relationship with the Company. "Customer" refers to any person or entity with whom you had actual contact during the last twenty-four (24) months you were employed by the Company, and also refers to any person or entity having a business relationship with the Company about whom you had knowledge obtained, during the last twenty-four (24) months you were employed by the Company, by virtue of your employment with the Company beyond any such knowledge available to the general public.

(Ex. A at 2-3.)

17.     Frank further acknowledged and agreed in the Participation Agreement that his "violation of any one or more of the covenants described above would irreparably damage the Bank.  If you breach or threaten to breach any covenant in this Agreement, the Bank may seek specific performance and/or injunctive relief against you, without posting bond, to prevent such continued or threatened breach, in addition to any other remedies available to it under this Agreement, at law, or in equity."  (Ex. A at 3.)

18.     The Participation Agreement contains a Tennessee choice-of-law provision and asserts that it "may be enforced by the parties in any state or federal court of competent jurisdiction."  (Ex. A at 5.)

5

19.     Frank further acknowledged and agreed in the Participation Agreement (and otherwise acknowledged and agreed in writing on an annual basis), that he would comply with First Horizon's Code of Business Conduct and Ethics and with its "*Matter of Principles*," which define First Horizon's property and contain employee acknowledgements of the need to maintain the confidentiality of First Horizon's Confidential Information and to protect and refrain from taking or using any of First Horizon's property, including, but not limited to, customer files, customer lists, reports, and other data and products developed by First Horizon.

20.     First Horizon's "*Matter of Principles*" incorporates First Horizon's Corporate Records Policy, Procedure and Retention Schedule, which confirms that all records of First Horizon, including email, are subject to First Horizon's records management guidelines.  A copy of "*Matter of Principles*" is attached hereto as **Exhibit B**.

21.     First Horizon's Code of Business Conduct and Ethics addresses the obligation of First Horizon employees to protect Confidential Information and provides that employees must maintain the confidentiality of all of First Horizon's Confidential Information, which it defines as any non-public information about First Horizon, its customers, suppliers, employees, shareholders or joint venture partners.  A copy of the Code of Business Conduct and Ethics is attached hereto as **Exhibit C**.

22.     First Horizon and its subsidiaries have over 500 business locations in 22 states, including 427 banking centers in twelve states.

23.     Frank is a registered broker in seven states and, in his role with First Horizon, engaged in financial services that affect interstate commerce, including providing brokerage and investment advice and coordinating electronic securities and banking transactions.

6

**Frank's Raid and Lift Out of First Horizon's "Frank Group" and Affiliated Bankers**

24.     Beginning no later than February 2022, Frank, in collusion with Pinnacle Financial Partners, Inc. ("Pinnacle"), a direct competitor of First Horizon, orchestrated a "lift out" of key private banking and investment personnel from First Horizon and its affiliates in Chattanooga.

25.     From February 2022 through the date of Frank's resignation, August 11, 2022, Frank actively recruited fellow FHA and First Horizon employees to leave First Horizon and join Pinnacle.

26.     On August 11, 2022, four other FHA employees—David Buntin, Kelsey Ridge, Teya Richardson, and Trip Butler—resigned without notice.  Each of these employees worked under Frank at FHA as part of a group known at and marketed by First Horizon as the "Frank Group."

27.     Frank, Buntin, Ridge, Richardson, and Butler informed FHA on August 11, 2022, in nearly identical resignation emails (some of which share identical errors), that they would "immediately" cease working for FHA and would become employed with Pinnacle and be registered as brokers with Raymond James Financial Services, Inc. ("Raymond James").

28.     The lack of any gap in time between the sudden resignation of Frank and four members of his team was no accident. Effective on the same date as their abrupt resignations, August 11, 2022, Frank, Buntin, Whitmire, Richardson, and Butler changed the employment information in their securities registration from FHA to Raymond James. As of no later than August 16, 2022, the "Frank Group," a team comprised of the five former First Horizon financial services employees that had comprised the Frank Group, were listed on a public website as registered financial advisors with Raymond James affiliated with Pinnacle and led by Frank.  A copy of this web publication is attached hereto as **Exhibit D** (last accessed August 18, 2022).

7

29.     In addition to the members of the Frank Group who resigned with him on August 11, 2022, Frank solicited an additional member of his team who is also a broker but was unsuccessful in persuading him to leave FHA.

30.     Frank also recruited at least three members of the First Horizon private client banking group in Chattanooga.  Two of those Bank employees, Christine Evans ("Evans") and Cheryl Garner ("Garner"), resigned from First Horizon to join Pinnacle.  Both Evans and Garner have extensive client relationships based on their long-term roles in private client banking at First Horizon.  Evans and Garner resigned from First Horizon on July 10, 2022.  Pinnacle publicly announced its hiring of Evans and Garner on August 11, 2022, the same day that that Frank and his four team members resigned from FHA.  A copy of the announcement is attached hereto as **Exhibit E**.

31.     The August 11, 2022 raid of First Horizon was the result of approximately six months of recruitment efforts by Frank, all conducted while he remained employed at FHA and while he was receiving deferred compensation awards from First Horizon under the Participation Agreement.

32.     For example, on or about March 30, 2022, while still employed at First Horizon, Frank personally arranged a meeting between Erik Garkovich, a member of First Horizon's private banking group, and Craig Holley, the chairman of Pinnacle in Chattanooga; Ryan Murphy, the area manager for Pinnacle's Chattanooga client services group, and Kenny Dyer, the regional president of Pinnacle in Chattanooga at Holley's personal residence in downtown Chattanooga.

33.     Frank acted as a conduit for Pinnacle, even discussing with Garkovich apparent concerns raised by Holley that Garkovich may be more interested in working in the Knoxville market than the Chattanooga market.

34.     Frank's recruitment efforts included communicating with target employees by text message.  An example of such recruitment is attached as **Exhibit F**.

35.     In that text exchange, which occurred four months prior to Frank's resignation from First Horizon, Frank solicited Garkovich, who had by then received an offer to work at Pinnacle following the meeting with Pinnacle's Chattanooga chairman that Frank had arranged:

Frank:  I'm told you have a good offer in front of you

A:      Oh…I don't really check that email on a daily basis.  Didnt realize they had sent an email.

Frank:  Anxious to hear your thoughts.

A:      Let me look through everything this evening.  Ill be at CBL tomorrow.

Frank:  I'm not sure I've said this and perhaps because I didn't want to say anything before you received an offer.  **We want and need you to be a part of us!**

(Ex. F) (emphasis added).

36.     As demonstrated by Frank's solicitation of these target banking employees, Frank's effort and intent was to solicit First Horizon customers to change their banking and financial services relationships to Pinnacle.

37.     As early as March 2022, while he was still employed at FHA, Frank solicited additional First Horizon and FHA employees to work at Pinnacle in blatant violation of his contractual duties to First Horizon.

**The Frank Group Removes Critical Customer Information from First Horizon**

38.     Frank's team compiled certain Confidential Information, including but not limited to, customer lists, customer account information, customer preferences, financial services offerings, and information regarding the fees charged for its financial services concerning some of First Horizon's most significant individual customers, and intentionally took that information when they left FHA to go to work for Pinnacle.

9

39.     First Horizon informed Frank, through his counsel, on August 17, 2022, that the Confidential Information was missing.  On August 25, 2022, a full week later, counsel for Frank acknowledged that the Confidential Information was in the possession of an undisclosed member of the Frank Group (later identified as Buntin) and promised to return it.

40.     This acknowledgment by Frank's counsel confirmed that this Confidential Information had been in the possession of a member of Frank's team for at least two weeks since his abrupt resignation.  The Confidential Information was returned to First Horizon's counsel on August 26, 2022.

41.     In addition to the conduct described in the preceding paragraphs, First Horizon became aware on August 25, 2022, that a member of Frank's team (later identified as Buntin) misappropriated other Confidential Information related to First Horizon customers that remained in his team's possession after the termination of their employment.

**Frank's Recruitment of First Horizon Customers in Violation of His Covenants**

42.     Prior to his resignation from First Horizon, Frank also enacted a scheme to solicit First Horizon customers to switch their financial services relationships to Pinnacle.

43.     In the two weeks prior to his exit, Frank set up several in-person meetings with many high net-worth First Horizon clients.

44.     On August 11, 2022, the same day of the Frank Group's "lift out" from First Horizon, a member of the Frank Group contacted by phone First Horizon customer CA[1] and offered to set up a meeting with Robert McCabe, the chairman of Pinnacle, in an effort to solicit

---

[1] First Horizon refers to the customers using codes to protect the customer's identity and to preserve confidentiality.  First Horizon will provide Frank with the full names of the referenced customers upon request.

CA to move financial services business from First Horizon to Pinnacle. On information and belief, these customer contacts were coordinated and directed by Frank.

45. On August 16, 2022, Frank set up lunch with Buntin and First Horizon client JA with the intent to discuss their "move" to Pinnacle.

46. On August 16, 2022, prior to learning all of the facts laid out in this Complaint, First Horizon sent Frank a letter, enclosing a copy of his Participation Agreement with First Horizon (and a copy of a separate agreement with FHA), reminding him of the non-solicitation covenants to which he agreed to be bound.

47. On August 22, 2022, First Horizon clients LS and CS advised First Horizon that while Frank and Buntin were still employed with FHA, they openly discussed their intent to leave FHA.

48. On August 29, 2022, First Horizon client CR advised First Horizon that during a meeting with the Frank Group, a member of that team advised him to refrain from conducting additional business with First Horizon because the Frank Group was planning to leave.

49. Given his extensive interactions with First Horizon's customers, Frank has unique knowledge about First Horizon customers' holdings, banking and other financial relationships, strategies, plans, needs, and objectives, and is thus able to influence the decisions of these customers, including their banking services decisions. Frank's influence, which he agreed in the Participation Agreement not to wield against First Horizon, poses a serious and unfair competitive risk to First Horizon's business and goodwill with these customers.

50. Frank is engaging in, and will continue to engage in, the improper solicitation of First Horizon's customers, directly or indirectly, by taking and using First Horizon's confidential

and proprietary data and information for his own personal gain, and to attract and acquire business for Pinnacle, in violation of the Participation Agreement.

51.     Frank is continuing to engage in this wrongful conduct individually and as the leader of the team of former FHA employees that he improperly recruited and now manages for the benefit of First Horizon's competitor, Pinnacle.

52.     First Horizon cannot put a price on the value of its business relationships with its customers and employees, its Confidential Information, or its business goodwill.  Consequently, Frank's breach of the Participation Agreement and improper use of First Horizon's Confidential Information for his own benefit and for the benefit of Pinnacle has caused irreparable harm to First Horizon.

## CAUSES OF ACTION

### COUNT I – MISAPPROPRIATION OF TRADE SECRETS
### UNDER THE DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1831 et seq.

53.     First Horizon hereby incorporates by reference the allegations set forth in the Facts section of this Verified Complaint as if fully restated herein.

54.     First Horizon is the owner of valuable trade secrets related to products used in, or intended for use in, interstate commerce, including financial information and business information defined as a trade secret under 18 U.S.C. § 1839(3).

55.     These trade secrets include First Horizon's Confidential Information, including, but not limited to, customer lists, customer account information, customer preferences, financial services offerings, and information regarding the fees charged for its financial services.

56.     First Horizon's Confidential Information is not generally known or readily ascertainable by proper means, and First Horizon derives a significant economic and competitive advantage in the institutional brokerage industry and the banking industry by maintaining the

security and confidentiality of its Confidential Information, which constitutes or includes trade secrets.

57.    First Horizon invested substantial time, money, and resources to develop its Confidential Information and, accordingly, takes reasonable and appropriate measures to maintain its secrecy.

58.    First Horizon's Confidential Information was communicated to Frank and his team members while—and only because—they occupied positions of trust and confidence as employees of FHA, a wholly-owned subsidiary of First Horizon, by which they were provided access to the Confidential Information of First Horizon.

59.    Frank has improperly used and will continue to use First Horizon's Confidential Information for the unauthorized purpose of competing with First Horizon in interstate commerce through Pinnacle and diverting First Horizon business to Pinnacle.

60.    Frank's misappropriation of First Horizon's trade secrets and Confidential Information constitutes a violation of the Defend Trade Secret Act, 18 U.S.C. § 1836(b)(1).

61.    Frank's conduct constitutes an intentional, willful, and malicious misappropriation of First Horizon's trade secrets and Confidential Information.

62.    As a direct and proximate result of Frank's ongoing misappropriation of First Horizon's trade secret Confidential Information, First Horizon has suffered and will continue to suffer irreparable injury for which First Horizon lacks an adequate remedy at law, including but not limited to,  loss of information, loss of secrecy of the information, lost business opportunities, and lost customers.  Accordingly, First Horizon is entitled to an injunction as well as damages, exemplary damages, and attorneys' fees pursuant to 18 U.S.C. § 1836(3).

## COUNT II – BREACH OF CONTRACT

63.     First Horizon hereby incorporates by reference the allegations set forth in the Facts section of this Verified Complaint as if fully restated herein.

64.     In exchange for being granted FHC RSUs under the Participation Agreement, Frank agreed, beginning on his Participation Date (May 12, 2020), and ending twelve months after the end of his employment, (August 11, 2022), that he would not (1) "directly or indirectly adversely affect or interfere with any relationship of [First Horizon]with any of its . . . employees [and] customers . . . .," ("non-interference"); (2) "in any manner, directly or indirectly, solicit, hire, or encourage any person who is then an employee of [First Horizon] to leave the employment of [First Horizon]" ("employee non-solicitation"); or (3) "in any manner directly or indirectly solicit or contact any person or entity who is a Customer of [First Horizon] at the time of such solicitation or contact, with the intent or effect of (i) providing one or more services to the Customer of providing one or more services to the Customer of a nature similar to services provided by [First Horizon] to customers generally, or (ii) encouraging the Customer to end, diminish, or move any of his, her, or its accounts or relationships away from [First Horizon], or (iii) encouraging the Customer to refrain from establishing, maintaining, or expanding any account or relationship with [First Horizon] ("customer non-solicitation")."

65.     The non-interference and non-solicitation provisions in Frank's Participation Agreement are reasonable and necessary to protect the legitimate business interests of First Horizon including, but not limited to, its employee and customer relationships, its goodwill, and its Confidential Information that it relies on in maintaining its customer relationships.

66.     The non-solicitation provisions are limited in scope and duration to what is reasonably necessary to protect First Horizon's protectable business interests and do not pose an undue hardship on Frank.

67.     Frank breached the non-interference provision in the Participation Agreement by interfering with First Horizon's relationship with at least eight First Horizon employees by soliciting them to work for Pinnacle while he continued to work at FHA, a subsidiary of First Horizon.

68.     Frank breached the employee non-solicitation provision in the Participation Agreement by actively and brazenly soliciting and recruiting at least eight First Horizon/FHA employees in coordination with Pinnacle to execute a scheme to raid and "lift out" key employees, ultimately resulting in the exit of Buntin, Whitmire, Richardson, Butler, Evans, and Garner, all while Frank remained employed at FHA, a wholly-owned subsidiary of First Horizon.

69.      Frank breached the customer non-solicitation provision in the Participation Agreement by initiating contact with First Horizon customers with whom he had relationships, either on his own or through his team, for the purpose of providing to the customers similar services or additional services also offered by First Horizon; soliciting the customers to end, diminish, or move their accounts and relationships away from First Horizon and to Pinnacle; or encouraging the customers to refrain from maintaining or expanding their accounts and relationship with First Horizon.

70.     Frank has contacted and solicited, and is likely to continue to contact and solicit, First Horizon customers for the purpose of inducing those customers to move their financial services relationships and accounts to Pinnacle.

15

71. Frank further breached the Participation Agreement by violating First Horizon's Code of Business Conduct and Ethics and *Matter of Principles* in a manner that would have resulted in discipline or termination from First Horizon had it discovered, investigated, and evaluated the violation prior to Frank's abrupt resignation, including by using, disclosing, or discussing First Horizon's Confidential Information in connection with his employment with Pinnacle and by misappropriating or destroying without authorization at least some known Confidential Information to the detriment of First Horizon.

72. First Horizon has suffered damages as a result of Frank's breaches of the Participation Agreement, including, but not limited to, the loss of goodwill, the loss of customer relationships, the loss of employees, harm to its competitive market position, and other harm.

73. First Horizon has suffered, and will continue to suffer, irreparable harm as a result of Frank's breaches of the Participation Agreement until such time that he is ordered to cease such actions and return any and all confidential and proprietary information in his possession to First Horizon. Injunctive relief is necessary as money damages are difficult to calculate and would not fully compensate First Horizon for Frank's breaches of his contractual obligations.

## COUNT III – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS

74. First Horizon hereby incorporates by reference the allegations set forth in the Facts section of this Verified Complaint as if fully restated herein.

75. First Horizon has developed and maintained advantageous business relationships with its clients.

76. Frank was at all relevant times aware of First Horizon's existing and prospective business relationships.

16

77.     Frank knowingly and intentionally interfered with First Horizon's existing and prospective business relationships.

78.     Frank knowingly and intentionally misappropriated First Horizon's Confidential Information, including, but not limited to, financial products, the fees charged to clients and customer account information.

79.     Frank interfered with First Horizon's business and prospective business relationships by intentionally, knowingly, and maliciously using improper means—including by working in secret to divert First Horizon's customer and employment relationships while still an employee of FHA—to adversely affect First Horizon's ability to service and develop existing and prospective business relationships by orchestrating the sudden and unexpected defections of at least six First Horizon and FHA employees.  Despite knowing that most of these employees had contractual and fiduciary obligations to First Horizon, Frank helped Pinnacle, a direct competitor to First Horizon, effectuate its lift out strategy by raiding First Horizon's employees to the detriment of First Horizon and its existing and prospective clients.

80.     First Horizon has suffered damages as a direct and proximate result of this tortious interference with First Horizon's existing and prospective business relationships by Frank.

81.     First Horizon is entitled to a judgment for damages against Frank for his tortious interference with First Horizon existing and prospective business relationships in an amount to be proved at trial.

82.     First Horizon is also entitled to punitive damages against Frank because he acted intentionally and maliciously to interfere with First Horizon's existing and prospective business relationships.

## COUNT IV – CONVERSION

83.     First Horizon hereby incorporates by reference the allegations set forth in the Facts section of this Verified Complaint as if fully restated herein.

84.     First Horizon has a property interest in its Confidential Information, including its trade secret, proprietary, and other confidential business information.

85.     Frank intended to and has in fact misappropriated First Horizon's Confidential Information to his own use and benefit in defiance of First Horizon's ownership of this information, including, but not limited to, by removing Confidential Information from First Horizon's premises and control.

86.     By improperly removing and possessing First Horizon's Confidential Information, Frank has converted this information in violation of Tennessee common law.

## COUNT V – MISAPPROPRIATION OF TRADE SECRETS UNDER THE TENNESSEE UNIFORM TRADE SECRETS ACT, TENN. CODE ANN. § 47-25-1701 et seq.

87.     First Horizon hereby incorporates by reference the allegations set forth in the Facts section of this Verified Complaint as if fully restated herein.

88.     Frank has engaged in actual and threatened misappropriation of trade secrets in violation of Tennessee Code Annotated § 47-25-1701 *et seq.* and applicable common law.

89.     First Horizon's Confidential Information is not generally known or readily ascertainable by proper means, and First Horizon derives a significant economic and competitive advantage in the institutional brokerage industry and the banking industry by maintaining the security and confidentiality of its Confidential Information, which constitutes or includes trade secrets.

18

90.     First Horizon invested substantial time, money, and resources to develop its trade secret Confidential Information and, accordingly, takes reasonable and appropriate measures to maintain its secrecy.

91.     First Horizon's Confidential Information was communicated to Frank and his team members while—and only because—they occupied positions of trust and confidence as employees of FHA, a wholly-owned subsidiary of First Horizon, by which they were provided access to the Confidential Information of First Horizon.

92.     Frank has improperly used and will continue to use First Horizon's trade secrets and Confidential Information for the unauthorized purpose of competing with First Horizon through Pinnacle and diverting First Horizon business to Pinnacle.

93.     Frank's conduct constitutes an intentional, willful, and malicious misappropriation of First Horizon's trade secrets and Confidential Information.

94.     As a direct and proximate result of Frank's ongoing misappropriation of First Horizon's Confidential Information, First Horizon has suffered and will continue to suffer irreparable injury for which First Horizon lacks an adequate remedy at law.  Accordingly, First Horizon is entitled to an injunction as well as damages, punitive damages, and attorneys' fees pursuant to Tennessee Code Annotated §§ 47-25-1701 *et seq.*

## **PRAYER FOR RELIEF**

WHEREFORE, First Horizon, in addition to the relief described above, respectfully prays for the following relief against Frank:

1.     Entry of preliminary and permanent injunctions pursuant to Fed. R. Civ. P. 65:

(a) Prohibiting Frank from directly or indirectly soliciting or initiating contact, in any manner (with the intent of providing any service or product competitive

with any service or product which is provided at the time of such contact by First Horizon) any customer of First Horizon or FHA with whom Frank had actual contact or knowledge of the relationship during the last twenty-four (24) months he was employed by First Horizon;

(b) Prohibiting Frank from disclosing the identity of First Horizon's customers, its methods of doing business, its pricing information, and all other Confidential Information of First Horizon to any third party, including Pinnacle;

(c) Prohibiting Frank from calling on or soliciting the business, directly or indirectly, any First Horizon customer with whom he had contact while at First Horizon;

(d) Prohibiting Frank from using, disclosing, or transmitting for any purpose First Horizon's Corporate Information, as that term is defined in First Horizon's *Matter of Principles*;.

(e) Prohibiting Frank from using, and requiring Frank to return to First Horizon, all Confidential Information and other documents and information relating to or derived from First Horizon's business or customers including, but not limited to, documents, materials, and confidential and proprietary data and information pertaining to First Horizon or FHA customers, including copies of any Confidential Information that was subsequently returned to First Horizon.

2.      Entry of an order requiring Frank to respond on an expedited basis to any discovery requests served on him prior to an injunction hearing;

3.      An award First Horizon monetary damages in an amount to be proved at trial, treble damages, punitive damages, and attorneys' fees;

4.      An award of pre- and post-judgment interest and costs;

5.      An award of all damages and remedies allowed by 18 U.S.C. § 1836(b)(3) and

Tenn. Code Ann. § 47-25-1701 *et seq.*

6.      An award of discretionary costs and court costs; and

7.      Any other and further relief to which First Horizon is entitled at law or in equity.

Respectfully submitted,

 */s/ Roger W. Dickson*
Roger W. Dickson, Tenn. BPR No. 001933
Zachary H. Greene, Tenn. BPR No. 024451
Jenna W. Fullerton, Tenn. BPR No. 036522
MILLER & MARTIN PLLC
1200 Volunteer Building
832 Georgia Avenue
Chattanooga, Tennessee 37402
Telephone: (423) 756-6600
roger.dickson@millermartin.com
zac.greene@millermartin.com
jenna.fullerton@millermartin.com

Jef Feibelman, Tenn. BPR No. 007677
     *\*Pro Hac Vice Forthcoming*
Lisa A. Krupicka, Tenn. BPR No. 010903
     *\*Pro Hac Vice Forthcoming*
Jennifer Shorb Hagerman, Tenn. BPR No. 020281
     *\*Pro Hac Vice Forthcoming*
Sarah E. Stuart, Tenn. BPR No. 035329
BURCH, PORTER & JOHNSON, PLLC
130 North Court Avenue
Memphis, Tennessee 38103
Telephone: (901) 524-5000
jfeibelman@bpjlaw.com
lkrupicka@bpjlaw.com
jhagerman@bpjlaw.com
sstuart@bpjlaw.com

***Attorneys for Plaintiffs First Horizon Bank and
First Horizon Corporation***

21

# **VERIFICATION**

STATE OF TENNESSEE
COUNTY OF SHELBY

     Comes now Tammy LoCascio, SEVP, Chief Operator Officer for First Horizon, having been duly sworn, makes oath and swears that I am an adult resident of Shelby County, Tennessee, am competent to testify as to the matters contained herein, that I have read the foregoing Verified Complaint for Injunctive and Other Relief, including the documents attached thereto and that, based on my personal knowledge and my examinations of the business records of First Horizon Bank and First Horizon Corporation kept in the regular course of its regularly conducted business activities, the facts stated in the Verified Complaint are true to the best of my knowledge, information, and belief, and that the records attached thereto are true and accurate copies of the business records of First Horizon Bank and First Horizon Corporation.

Tammy LoCascio

CHERYL BELL
STATE OF TENNESSEE
NOTARY PUBLIC
SHELBY COUNTY
MY COMMISSION EXPIRES JUNE 2, 2024

Notary Public

My Commission expires: June 2, 2024