# Exhibit 1

## Declaration of Christopher G. Frank

The undersigned hereby declares pursuant to 28 U.S.C.§ 1746:

1) My name is Christopher G. Frank. I am 57 years old and am competent to testify.

2) I have a clean compliance and regulatory record, with no customer complaints.

3) I have worked in the securities industry for 32 years. Approximately 27 years ago in 1995, I joined First Tennessee Brokerage, Inc., the name of which has been changed several times and is now known as First Horizon Advisors, Inc. ("FH Advisors"). FH Advisors is a subsidiary of First Horizon Bank ("FH Bank"), which provides, among other things, wealth management services mainly to individuals and small businesses.

4) My sole employer was FH Advisors. It is a broker-dealer registered with Financial Industry Regulatory Authority ("FINRA"). Until my resignation, my securities licenses were held by FH Advisors. (My former employment status is reflected in the attached FINRA BrokerCheck Report, at p. 6, attached as **Exhibit A**). I understand that all disputes between my employer and me are subject to mandatory arbitration before FINRA.

5) At the time of my resignation, I was not an employee of First Horizon Corporation (the "Holding Company") or of FH Bank. Our Team was also only employees of FH Advisors and not an employee of the Holding Company and/or the Bank. My direct supervisor was Mr. Harold Robertson, a Senior Vice President and Managing Director for FH Advisors. *See* Mr. Robertson's LinkedIn profile attached as **Exhibit B**. I had no direct supervisor from FH Bank. Indeed, I was instructed on multiple occasions to tell customers that I was not employed by nor worked for FH Bank. This was at least in part to prevent clients from assuming that their investment accounts were not insured by the FDIC.

1

6) During my tenure at FH Advisors, the producers on our Team[1] functioned as joint venturers with FH Advisors, sharing in the expenses of building and maintaining our book of clients — expenses that are typically paid for by one's employer. The expenses we helped shoulder included the salaries of some of our staff and monthly performance reporting. These costs were paid with commission/fee income that Mr. David Buntin and I earned from our production—money that we would have otherwise personally received. For example, we paid more than half the compensation for Ms. Kelsey Ridge. This amounted to over $78,000 last year alone. This is also true for Mr. Wesley Terwilleger, a young producer whose salary Mr. Buntin and I largely covered out of our own commissions. It was important for us to incur these expenses because we saw them as vital to developing and maintaining our relationships with our clients.

7) During my employment at FH Advisors, I referred non-trust banking business to FH Bank employees. I received no financial compensation for referrals.

8) While I did sign the Participation Agreement attached to the Verified Complaint (*see* ECF 1-1), there was no "negotiation" between anyone and myself concerning its terms as alleged by Tammy LoCasio in her Declaration submitted in support of First Horizon's Motion for Leave to Seal. *See* ECF 4, PageID 72. Instead, the Participation Agreement was merely presented to me for signature. It appeared like other incentive bonus agreements I had signed in the past and I was not told that it was designed to impose onerous and unreasonable restrictions on my ability to make a living if I left my job with FH Advisors.

---

[1] Our Team means the "Frank Team" consisting of my partner, Mr. Buntin; an advisor in training, Ms. Ridge; and our support staff, Ms. Teya Richardson and Mr. Trip Butler (hereinafter collectively my "Team"). While at FH Advisors, it also included a junior partner, Mr. Terwilleger, who wanted to separate from our Team and stay at First Horizon.

2

9) On February 28, 2022, Toronto-Dominion Bank Group ("TD" or "TD Bank") announced that it was acquiring FH Bank and its subsidiaries, including FH Advisors (the "TD Takeover").

10) On August 11, 2022, I resigned from FH Advisors to join Pinnacle Asset Management ("Pinnacle") and Raymond James Financial Services, Inc. ("RJFS").[2]

11) My decision to resign from FH Advisors was multi-faceted, as detailed below. However, my decision ultimately was due to the failure of FH Advisors and TD Bank to offer any reassurances or commitments concerning how this merger would affect my clients and our team.

12) Industry competitors have pursued me regularly throughout my career, and this increased with the TD Bank announcement. Members of FH Advisor's management were aware of these recruitment efforts and did not discourage advisors from exploring other opportunities. This resulted in my considering whether remaining at FH Advisors was in my best interest.

13) FH Bank, formerly First Tennessee Bank, is a regional bank founded in Memphis over 155 years ago and which, until now, was headquartered in Tennessee. As of the end of 2021, it had $89 billion in assets, and just over $3 billion in gross revenue.

14) TD Bank, which is based in Canada, is huge in comparison to FH Bank. As of the end of 2021, it had $423 billion in assets, and over $33 billion in gross revenue. At the end of 2021, FH Bank ranked as the 41st largest bank in America while TD Bank ranked as the 6th largest bank in *all of North America*.

15) In 2021, FH Advisors generated approximately 3% of FH Bank's revenues.

---

[2] While I am an employee of Pinnacle, my securities licenses are held by RJFS and the brokerage/advisory services I offer to my clients are offered through RJFS.

16) In published reports, TD Bank has repeatedly said that it was attracted to FH Bank because of its commercial lending business. (*See e.g.*, **Exhibit C**).

17) Our team was one of FH Advisor's top revenue earning teams. Given this and FH Advisors' relatively small size, I was well connected within the organization, and was on a first name basis with every executive at FH Advisors.

18) Following the announcement of the TD Takeover in February, I immediately had questions about how this acquisition would affect our team and our hundreds of clients. Week after week went by and my managers had no answers. Even by six (6) months later, I still did not have information about some of the most basic issues, such as:

- Will we be allowed to service our clients in the ways we do now?
- What technological platforms does TD use?
- What products and investments will we be able to offer to our clients?
- Does TD have a similar advisory practice and, if so, how does it differ from FH Advisors?
- How are TD's advisors paid and will our compensation change?

Management's on-going inability to answer such basic questions left me with serious concerns about TD Bank and whether it was equipped to support a large advisory team that operated like mine.

19) TD Bank's eventual "retention packages" offered to advisors to retain them made clear that it had no serious interest in large advisory teams such as ours. It is now common for top producers to receive recruiting bonuses of 200% or more of their past production, yet TD Bank's package equaled less than approximately 10%of past production.

4

20) FH Advisors' managers were aware that advisors were exploring other opportunities because of TD Bank's silence, yet did not discourage these actions. TD Bank did not demonstrate any interest in our advisory practice.

21) My supervisor at FH Advisors, Mr. Harold Robertson, knew that I and other advisors he supervised were exploring outside opportunities. Mr. Robertson could not tell me TD's plans and he did not discourage me from exploring other opportunities. In one instance, Mr. Robertson learned that another advisor was talking with a competitor because she had used her First Horizon email to send information about her book of business to the recruiting firm. Mr. Robertson's only response was to ask him to be more discrete. In another instance, an advisor spent an entire day with Mr. Robertson who came away with the conclusion that the advisor wanted to leave First Horizon and join Raymond James. It appeared to me that management had no confidence that TD cared about me or my clients.

22) On August 2, 2022, TD announced it was buying securities firm Cowen Inc. for $1.3 billion. Published reports state that the head of Cowen—which specializes in investment banking and IPOs—will head up at least part of TD Bank's securities arm. At a minimum, this means years of disruption as the securities operations of three (3) different firms would either operate separately or integrate under Cowen's management team. Consequently, I believe that our type of practice of providing investment management services to middle-market individuals and businesses will be even less of a focus for TD Bank.

23) Following the announcement of the TD Takeover, numerous clients expressed concern over how the merger could impact them. While I did not tell clients that I may leave, many clients made it clear that I should advise them where I went if I resigned.

24) Clients need to know how to reach their advisors, particularly when markets are turbulent. The market has been notably volatile this year. The below chart reflects the Nasdaq's performance this year to date (through September 13, 2022), showing a 26.05% decline over the past nine and a half months.



25) The securities industry recognizes that I owe certain fiduciary and ethical obligations to my clients as a product of the level of trust my clients have placed in me. These obligations include notifying clients that I have changed firms and where I can be contacted.

26) I have not solicited my clients to follow me to Pinnacle/RJFS. Rather, I have merely called clients to make announcements in order to tell them that I had left FH Advisors and where I am employed now. To the extent those clients have chosen to follow me, they have done so on

their own volition.[3] To my knowledge, I never agreed to not inform clients about where I am located, nor did I agree to not contact my clients. To do so would harm my clients, and it is the client's right to choose who manages his or her investments. I have only made announcement calls to former FH Advisors clients who we serviced and not any person who was merely a client of FH Bank.

27) To the extent any client wishes to switch to Pinnacle, I attribute this to the exceptional quality of the service we attempt to provide and to the comprehensive nature of our services. It also includes providing clients with tax, estate, and financial planning services, as well as credit monitoring and comprehensive data aggregation services.[4]

28) Since leaving FH Advisors, clients have stated that First Horizon personnel have not always been forthright with clients, misleading them about their ability to transfer their accounts to Pinnacle or about how they can contact me or our team. Such activity, which I believe violates FINRA Rules, shows just how important it is for us to make announcements to clients.

29) Announcements are also vital to make sure that clients and their accounts are properly cared for. While we left FH Advisors now over a month ago, we still hear from clients that are surprised by our departure, having been called only recently (or not at all) by FH Advisors about our departure. These clients thus had no idea that their accounts were no longer being monitored by us—or apparently anyone else at FH Advisors. Only someone that has sat down and spoken with a client can truly "know their customer," as is required by the securities laws.

---

[3] In addition, a number of clients have affirmatively sought me out in order to continue doing business with me.

[4] Data aggregation services gather publicly available information and personal account information from many sources and presents that information in a consolidated format to the client.

Numerous clients have told me that they have had no contact from FH Advisors since our departure.

30) While I was employed at FH Advisors, it was expected that advisors would use their personal cell phones to communicate with clients. While FH Advisors expected us to use our personal cell phones for work, it did not pay for my phone nor its service.

31) FH Advisors previously provided company-owned phones and supplied cell service but this practice was eliminated more than ten years ago as a cost-savings measure. Employees have since been solely responsible for these expenses.

32) While at some point FH Advisors invited us to access First Horizon platforms from our phones, I did not take them up on this offer because I had no need to remotely access those platforms. I did not even have my company-issued email address routed through my phone. My supervisors, however, knew that I used my cell phone for business purposes.

33) As the company knew and expected, I used my personal cell phone for calls to and from clients. I stored the clients name and phone number in my phone as a matter of practice. I do not recall ever being told by First Horizon that I could not store client contact information on my cell phone.

34) My monthly cell phone bill details all calls, including telephone numbers, made or received during that month, whether personal or professional in nature. This includes calls made by or received from clients.

35) I alone am responsible for payment of my monthly phone service and any billing statements related thereto belong to me. Consistent with this, FH Advisors and/or FH Bank has never attempted to control the use of my phone or the billing statements related thereto. It has not attempted to review my phone bills or my phone—nor should it because these things belong

8

to me. FH Advisors has not demanded that I restrict access to these bills or otherwise treat them as confidential information.

36) When I resigned from FH Advisors, no one asked to see the contents of my phone or asked if I had any client contact information stored thereon. The same is true for others on our team. I understand that this is not unusual, and that other employees who have left FH Advisors or FH Bank have had a similar experience.

37) Contact information for my clients is available on the internet via publicly accessible databases such as Spokeo.com and Whitepages.com.

38) Contrary to the FH Bank's statement in its Verified Complaint (at paragraph 13), I had regular access only to certain information at FH Advisors and even then, typically regarding only my clients, to whom I provided brokerage, advisory and insurance services. I did not provide banking services. I had only incidental access to FH Bank related information.

39) I had no executive or managerial duties at FH Advisors besides overseeing the business aspects of our Team. Instead, our team and I were supervised by several layers of FH Advisor management, including the Divisional Director, the President of FH Advisors, and the CEO of FH Advisors. I had no manager from FH Bank since I was not a FH Bank employee.

40) I did not directly or indirectly solicit any person on our team to follow me to Pinnacle/RJFS. Each member of our team made that decision on their own. As the TD Takeover unfolded, I expressed my concern to other Team members that our practice and clients may suffer as a result, and asked each to re-evaluate what was in their best interest. I did not solicit or encourage anyone on the Team to leave FH Advisors—rather, they made that decision on their own after they re-evaluated their employment in light of the TD Takeover. This is reflected by the fact that one of our team members—Mr. Terwilleger—decided to stay with FH Advisors.

9

Mr. Terwilleger made the decision to stay at FH Advisors in April and I have not spoken to him about this subject matter since then.

41) I also did not solicit any First Horizon employees, including Mr. Erik Garkovich, Ms. Chris Evans, or Ms. Cheryl Garner. These individuals initially expressed an interest in following me if I was going to leave before I was even considering leaving.

42) I did not arrange a meeting with Pinnacle for Mr. Garkovich,  and I have not spoken to him since early April.

43) Ms. Evans and Ms. Garner left First Horizon a full month before I did—well before I decided to join Pinnacle. At the time of their departure, I was still considering other employers (e.g., UBS) or even staying at FH Advisors.

44) I have not solicited any First Horizon employees since my departure and have no intention, desire, or need to hire any First Horizon employees.

{SIGNATURE PAGE FOLLOWS}

10

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 23rd day of __September__, 2022.

_____

**CHRISTOPHER GEORGE FRANK**

# **Exhibit A**



**BrokerCheck Report**

# CHRISTOPHER GEORGE FRANK

CRD# 2100400

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Broker Qualifications | 2 - 4 |
| Registration and Employment History | 6 - 7 |

 Please be aware that fraudsters may link to BrokerCheck from phishing and similar scam websites, trying to steal your personal information or your money. Make sure you know who you're dealing with when investing, and contact FINRA with any concerns.

For more information read our investor alert on imposters.

**About BrokerCheck®**



BrokerCheck offers information on all current, and many former, registered securities brokers, and all current and former registered securities firms. FINRA strongly encourages investors to use BrokerCheck to check the background of securities brokers and brokerage firms before deciding to conduct, or continue to conduct, business with them.

- **What is included in a BrokerCheck report?**
- BrokerCheck reports for individual brokers include information such as employment history, professional qualifications, disciplinary actions, criminal convictions, civil judgments and arbitration awards. BrokerCheck reports for brokerage firms include information on a firm's profile, history, and operations, as well as many of the same disclosure events mentioned above.
- Please note that the information contained in a BrokerCheck report may include pending actions or allegations that may be contested, unresolved or unproven. In the end, these actions or allegations may be resolved in favor of the broker or brokerage firm, or concluded through a negotiated settlement with no admission or finding of wrongdoing.
- **Where did this information come from?**
- The information contained in BrokerCheck comes from FINRA's Central Registration Depository, or CRD® and is a combination of:
  - information FINRA and/or the Securities and Exchange Commission (SEC) require brokers and brokerage firms to submit as part of the registration and licensing process, and
  - information that regulators report regarding disciplinary actions or allegations against firms or brokers.
- **How current is this information?**
- Generally, active brokerage firms and brokers are required to update their professional and disciplinary information in CRD within 30 days. Under most circumstances, information reported by brokerage firms, brokers and regulators is available in BrokerCheck the next business day.
- **What if I want to check the background of an investment adviser firm or investment adviser representative?**
- To check the background of an investment adviser firm or representative, you can search for the firm or individual in BrokerCheck. If your search is successful, click on the link provided to view the available licensing and registration information in the SEC's Investment Adviser Public Disclosure (IAPD) website at https://www.adviserinfo.sec.gov. In the alternative, you may search the IAPD website directly or contact your state securities regulator at http://www.finra.org/Investors/ToolsCalculators/BrokerCheck/P455414.
- **Are there other resources I can use to check the background of investment professionals?**
- FINRA recommends that you learn as much as possible about an investment professional before deciding to work with them. Your state securities regulator can help you research brokers and investment adviser representatives doing business in your state.
-

**Thank you for using FINRA BrokerCheck.**



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



## CHRISTOPHER G. FRANK
CRD# 2100400

**Currently employed by and registered with the following Firm(s):**

**(B) RAYMOND JAMES FINANCIAL SERVICES, INC.**
801 BROAD STREET
2nd FLOOR
CHATTANOOGA, TN 37402
CRD# 6694
Registered with this firm since: 08/11/2022

**(IA) RAYMOND JAMES FINANCIAL SERVICES ADVISORS, INC**
801 Broad St
FL 2
Chattanooga, TN 37402
CRD# 149018
Registered with this firm since: 08/11/2022

# Report Summary for this Broker

This report summary provides an overview of the broker's professional background and conduct. Additional information can be found in the detailed report.

## Broker Qualifications

**This broker is registered with:**
- 1 Self-Regulatory Organization
- 9 U.S. states and territories

**This broker has passed:**
- 1 Principal/Supervisory Exam
- 2 General Industry/Product Exams
- 1 State Securities Law Exam

## Registration History

**This broker was previously registered with the following securities firm(s):**

**(IA) FIRST HORIZON ADVISORS, INC**
CRD# 17117
MEMPHIS, TN
10/2013 - 08/2022

**(B) FIRST HORIZON ADVISORS, INC.**
CRD# 17117
CHATTANOOGA, TN
02/2000 - 08/2022

**(IA) FTB ADVISORS, INC.**
CRD# 143830
MEMPHIS, TN
01/2010 - 10/2013

## Disclosure Events

All individuals registered to sell securities or provide investment advice are required to disclose customer complaints and arbitrations, regulatory actions, employment terminations, bankruptcy filings, and criminal or civil judicial proceedings.

Are there events disclosed about this broker?  **No**

◆2022 FINRA. All rights reserved. Report about CHRISTOPHER G. FRANK                                                    1



# Broker Qualifications

## Registrations

This section provides the self-regulatory organizations (SROs) and U.S. states/territories the broker is currently registered and licensed with, the category of each license, and the date on which it became effective. This section also provides, for every brokerage firm with which the broker is currently employed, the address of each branch where the broker works.

**This individual is currently registered with 1 SRO and is licensed in 9 U.S. states and territories through his or her employer.**

## Employment 1 of 2

| | |
|---|---|
| Firm Name: | **RAYMOND JAMES FINANCIAL SERVICES ADVISORS, INC** |
| Main Office Address: | **880 CARILLON PARKWAY**<br>**SAINT PETERSBURG, FL  33716** |
| Firm CRD#: | **149018** |

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| IA  Tennessee | Investment Adviser Representative | APPROVED | 08/11/2022 |

## Branch Office Locations

This individual does not have any registered Branch Office where the individual is located.

## Employment 2 of 2

| | |
|---|---|
| Firm Name: | **RAYMOND JAMES FINANCIAL SERVICES, INC.** |
| Main Office Address: | **880 CARILLON PARKWAY**<br>**ST. PETERSBURG, FL  33716** |
| Firm CRD#: | **6694** |

| SRO | Category | Status | Date |
|---|---|---|---|
| B  FINRA | General Securities Principal | APPROVED | 08/11/2022 |
| B  FINRA | General Securities Representative | APPROVED | 08/11/2022 |

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| B  Alabama | Agent | APPROVED | 08/11/2022 |
| B  Arizona | Agent | APPROVED | 08/11/2022 |

©2022 FINRA. All rights reserved. Report about CHRISTOPHER C FRANK



## Employment 2 of 2, continued

| U.S. State/ Territory | Category | Status | Date |
|---|---|---|---|
| B Colorado | Agent | APPROVED | 08/11/2022 |
| B Florida | Agent | APPROVED | 08/11/2022 |
| B Georgia | Agent | APPROVED | 08/11/2022 |
| B Montana | Agent | APPROVED | 08/11/2022 |
| B North Dakota | Agent | APPROVED | 09/09/2022 |
| B Tennessee | Agent | APPROVED | 08/11/2022 |
| B Virginia | Agent | APPROVED | 09/08/2022 |

## Branch Office Locations

**RAYMOND JAMES FINANCIAL SERVICES, INC.**
801 BROAD STREET
2nd FLOOR
CHATTANOOGA, TN 37402

## Broker Qualifications



### Industry Exams this Broker has Passed

This section includes all securities industry exams that the broker has passed. Under limited circumstances, a broker may attain a registration after receiving an exam waiver based on exams the broker has passed and/or qualifying work experience. Any exam waivers that the broker has received are not included below.

**This individual has passed 1 principal/supervisory exam, 2 general industry/product exams, and 1 state securities law exam.**

### Principal/Supervisory Exams

| Exam | | Category | Date |
|------|------|----------|------|
| B | General Securities Principal Examination | Series 24 | 04/27/2000 |

### General Industry/Product Exams

| Exam | | Category | Date |
|------|------|----------|------|
| B | Securities Industry Essentials Examination | SIE | 10/01/2018 |
| B | General Securities Representative Examination | Series 7 | 12/17/1990 |

### State Securities Law Exams

| Exam | | Category | Date |
|------|------|----------|------|
| B | Uniform Securities Agent State Law Examination | Series 63 | 12/27/1990 |

Additional information about the above exams or other exams FINRA administers to brokers and other securities professionals can be found at www.finra.org/brokerqualifications/registeredrep/.

©2022 FINRA. All rights reserved. Report about CHRISTOPHER C FRANK

## Broker Qualifications



### Professional Designations

This section details that the representative has reported **0** professional designation(s).

No information reported.

♦2022 FINRA. All rights reserved. Report about CHRISTOPHER G FRANK

# Registration and Employment History



## Registration History

The broker previously was registered with the following firms:

| | Registration Dates | Firm Name | CRD# | Branch Location |
|---|---|---|---|---|
| IA | 10/2013 - 08/2022 | FIRST HORIZON ADVISORS, INC | 17117 | CHATTANOOGA, TN |
| B | 02/2000 - 08/2022 | FIRST HORIZON ADVISORS, INC. | 17117 | CHATTANOOGA, TN |
| IA | 01/2010 - 10/2013 | FTB ADVISORS, INC. | 143830 | MEMPHIS, TN |
| IA | 03/2004 - 03/2012 | FTB ADVISORS, INC. | 17117 | CHATTANOOGA, TN |
| B | 02/1998 - 03/1998 | SUNTRUST SECURITIES, INC. | 17499 | ATLANTA, GA |
| B | 12/1995 - 02/1998 | FIRST TENNESSEE BROKERAGE, INC. | 17117 | MEMPHIS, TN |
| B | 12/1990 - 12/1995 | J.C. BRADFORD & CO. | 1287 | NEW YORK, NY |

## Employment History

This section provides up to 10 years of an individual broker's employment history as reported by the individual broker on the most recently filed Form U4.

**Please note that the broker is required to provide this information only while registered with FINRA or a national securities exchange and the information is not updated via Form U4 after the broker ceases to be registered. Therefore, an employment end date of "Present" may not reflect the broker's current employment status.**

| Employment | Employer Name | Position | Investment Related | Employer Location |
|---|---|---|---|---|
| 08/2022 - Present | Pinnacle Asset Management | Employee | Y | Chattanooga, TN, United States |
| 08/2022 - Present | Pinnacle Bank /Pinnacle Financial Partners | Employee | Y | Chattanooga, TN, United States |
| 08/2022 - Present | Raymond James Financial Services Advisors, Inc | Investment Adviser Representative | Y | Chattanooga, TN, United States |
| 08/2022 - Present | Raymond James Financial Services, Inc | Registered Representative | Y | Chattanooga, TN, United States |
| 10/2013 - 08/2022 | FTB ADVISORS, INC. | Mass Transfer | Y | CHATTANOOGA, TN, United States |
| 02/1998 - 08/2022 | FIRST TENNESSEE BROKERAGE INC | REGISTERED REP | Y | CHATTANOOGA, TN, United States |

# Registration and Employment History



## Other Business Activities

This section includes information, if any, as provided by the broker regarding other business activities the broker is currently engaged in either as a proprietor, partner, officer, director, employee, trustee, agent or otherwise. This section does not include non-investment related activity that is exclusively charitable, civic, religious or fraternal and is recognized as tax exempt.

Pinnacle Asset Management- 08/2022 - Chattanooga, TN - DBA Support company - Investment related - 160/132 hrs per month - Employee

Pinnacle Bank /Pinnacle Financial Partners - 08/2022 - Chattanooga, TN -Financial Services - Investment related - 160/132 hrs per month - Employee

©2022 FINRA. All rights reserved. Report about CHRISTOPHER G FRANK

**End of Report**



**This page is intentionally left blank.**

©2022 FINRA. All rights reserved. Report about CHRISTOPHER C FRANK

# **Exhibit B**





# **Exhibit C**

# TD Bank to acquire Memphis-based First Horizon

By **Delaware Business Now** - March 7, 2022



Adver ᵗˢᵉmen T

TD Bank Group and First Horizon Corporation signed a definitive agreement for TD to acquire First Horizon in an all-cash transaction valued at $13.4 billion.

Canada-based TD wants to move into the ranks of the largest U.S. banks. Its U.S. headquarters is in Cherry Hill, NJ. First Horizon is based in Memphis.

TD has a dozen offices in Delaware as well as a credit card operation. TD's U.S. bank is the largest in the Delaware Valley in total deposits, according to the *Philadelphia Business Journal.*

Advertisement

"First Horizon is a great bank and a terrific strategic fit for TD. It provides TD with immediate presence and scale in highly attractive adjacent markets in the U.S. with significant opportunity for future growth across the Southeast," said Bharat Masrani, group president and Chief Executive Officer, TD. "Working with the First Horizon team, TD will build upon the success of its strong franchise and deliver the legendary customer experiences that differentiate us in every market across our footprint."

"I am excited to welcome First Horizon's associates, leaders, and valued customers to TD once the transaction closes. As one team, with complementary businesses, distribution channels, and a shared culture of best-in-class customer service, we will chart the next phase of growth together," said Salom. "The Southeastern U.S. represents a tremendous opportunity for TD and the addition of First Horizon's commercial and specialty banking capabilities will position us as a leading national player in commercial banking. We will combine our resources and capabilities and continue to invest in the region as we focus on delivering the most differentiated banking experience in our markets."

TD says the acquisition will make it the sixth-largest U.S. bank, with 1,560 stores in 22 states. TD's global operations have more than  2,600 branches.

First Horizon operates 412 branches across 12 states in the Southern states. It will also add the TD's presence in Florida, the Carolinas and Virginia.

The acquisition is slated to be completed in the first quarter of 2023 and is subject to approvals by U.S. and Canadian regulators as well as shareholders of First Horizon.

**Delaware Business Now**

Posts labeled Special to Delaware Business Now are typically submitted items that are updated and sometimes rewritten in news style. Background information is sometimes added.